UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Christopher L. Levy )<br><br>         Plaintiff, )<br>v. )<br> )<br>Deployed Services, LLC, )<br> )<br>         Defendant. )<br> ) | Docket No. _____<br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

### **Parties**

1.       The Plaintiff, Christopher L. Levy, resides at 28 Mount Huggins Drive, Swanzey, New Hampshire, 03446.

2.       The Defendant, Deployed Services, LLC ("DS"), is a Florida corporation. DS's principal office address is 6820 West Linebaugh Avenue, Suite 105, Tampa, Florida, 33625, with a mailing address of 164 McPike Road, Rome, New York, 13441.  DS's Registered Agent is Richard Stapleton, 6820 West Linebaugh Avenue, Suite 105, Tampa, Florida, 33625.

### **Jurisdiction and Venue**

3.       Plaintiff's claim arises under NH's Whistleblowers' Protection Act (RSA 275-E:2), and New Hampshire Common Law.

4.        Upon information and belief, at all times relevant hereto, DS has engaged in an industry affecting interstate commerce.

5.       Diversity jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1).

6.       Plaintiff is a citizen of New Hampshire.

7.       DS is a Florida corporation with a principal place of business in Florida.

8.      The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      DS operates facilities around the country, including in Texas and North Carolina. These facilities are maintained for the purpose of providing services to DS's clients.

10.      DS does not maintain offices in which corporate employees can work.  DS's corporate employees do not have an option to work onsite.

11.      Rather, nearly all DS's corporate employees work remotely, except for visits to DS's sites.

12.      As a corporate employee, Plaintiff was assigned by DS to work from his home. Plaintiff worked for DS remotely from his home in New Hampshire.

13.      At least two other employees of DS also worked remotely from their homes in New Hampshire.

14.      The unlawful acts complained of were committed within the State of New Hampshire.

## **Facts**

15.      DS has a contract and/or contracts with the United States Government (the "Government") for direct care and supervision services of migrant children in Greensboro, North Carolina, and Dimmit County, Texas.

16.      When providing direct care and supervision services, DS's contract with the government requires it to follow the United States Department of Health and Human Services Office of Refugee Resettlement ("ORR") Unaccompanied Children Bureau Policy Guide (the "Policy"), available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

17.     Pursuant to the Policy, ORR requires DS to provide trainings (the "Trainings") on, among several topics, Preventing, Detecting, and Responding to Sexual Abuse and Harassment to personnel who work at the Greensboro, North Carolina, and Dimmit County, Texas, sites.

18.     ORR sets the requirements for the Trainings.

19.     ORR's requirements include:

All employees who may have contact with unaccompanied children must complete trainings on the following:

- ORR and the care provider facility's zero tolerance policies for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior;
- The right of unaccompanied children and staff to be free from sexual abuse, sexual harassment, and inappropriate sexual behavior;
- Definitions and examples of prohibited and illegal sexual behavior;
- Recognition of situations where sexual abuse, sexual harassment, and inappropriate sexual behavior may occur;
- Recognition of physical, behavioral, and emotional signs of sexual abuse and methods of preventing and responding to such occurrences;
- How to avoid inappropriate relationships with unaccompanied children;
- How to communicate effectively and professionally with unaccompanied children, including unaccompanied children who are lesbian, gay, bisexual, transgender, questioning, or intersex;
- Procedures for reporting knowledge or suspicion of sexual abuse, sexual harassment, or inappropriate behavior as well as how to comply with relevant laws related to mandatory reporting;
- The requirement to limit reporting of sexual abuse, sexual harassment, and inappropriate sexual behavior to staff with a need-to-know in order to make decisions concerning the victim's welfare and for law enforcement, investigative, or prosecutorial purposes;
- Cultural sensitivity toward diverse understanding of acceptable and unacceptable sexual behavior and appropriate terms and concepts to use when discussing sex, sexual abuse, sexual harassment, and inappropriate sexual behavior with a culturally diverse population;
- Sensitivity regarding trauma commonly experienced by unaccompanied children;
- Knowledge of existing resources for unaccompanied children inside and outside the care provider facility, such as **trauma-informed** treatment, counseling, and legal advocacy for victims;
- General cultural competency and sensitivity to the culture and age of unaccompanied children; and

- Proper procedures for conducting professional pat-down searches, including cross-gender pat-down searches and searches of transgender and intersex unaccompanied children in a respectful and least intrusive manner.

**New employees must complete training before gaining access to children.** All employees must complete refresher trainings on the above topics every year or with any policy change or update, whichever comes first. All employees must receive ORR-provided refresher training about avoiding inappropriate relationships and reporting sexual abuse and sexual harassment every six (6) months.

ORR Unaccompanied Children Bureau Policy Guide § 4.3.6, *available at*

*https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-4#4.3.6/* (emphasis added).

20.    Personnel are required to complete the Trainings before they physically enter areas of the facilities on DS's sites in North Carolina and Texas where they may have contact with unaccompanied children.

21.    Ensuring that only appropriately trained personnel enter the sites is an important safety measure to protect the children who are within DS's care and/or supervision.

22.    DS hired Mr. Levy as a contract employee in March of 2022.

23.    Mr. Levy was hired to develop training to meet ORR's Policy requirements for facilities that would house unaccompanied children who cross the United States borders without proper documentation.

24.    Following the requirements set forth by ORR, restated here in ¶19, Mr. Levy developed five Trainings: Preventing Sexual Assault (PSA), Trauma Informed Care, Cultural Competency, Child Level Events (CLE), Program Level Events (PLE), and Flores Settlement (regarding requirements for detaining and care of children).

25.    Before Mr. Levy worked at DS, he was employed by the United States Department of Homeland Security for over 20 years.

26.     On June 1, 2022, Mr. Levy became a regular employee of DS.

27.     Mr. Levy worked for DS as a Project Coordinator.  In this role, Mr. Levy led DS's ORR Training Department.

28.     After Mr. Levy became a regular employee, he was told that his title would be changed to Care Services Training Manager, but his title was never changed.

29.     The Training Department was responsible for developing the Trainings, conducting the Trainings, and ensuring compliance with ORR's requirements.

30.     DS used training management software, KPA, to track personnel training.

31.     Shortly after Mr. Levy began employment, he learned that DS permitted personnel who had not completed the Trainings, to enter portions of the sites where they may have contact with unaccompanied children.

32.     The Dimmit, TX, site was separated into two sections.  An outer section, where children were not housed, and an inner section, where unaccompanied children were housed.

33.     However, the facility's security protocols did not distinguish between trained personnel and untrained personnel when determining who would be permitted to enter the inner sections of the facility.

34.     The North Carolina site only had one section. Unaccompanied children were to be housed in this section.  Thus, any employee who entered the North Carolina site was required to complete the Trainings before entering the site.

35.     Mr. Levy learned the personnel who had not completed the Trainings were entering the inner section of the Texas site and the North Carolina site by running reports in DS's learning management software, KPA.

36.     The reports showed that over 100 individuals had been permitted to enter portions of the sites where they may have contact with unaccompanied children, without first completing the Trainings.

37.     Mr. Levy raised a concern about this to his supervisor, Christopher Jensen, Director of Operations.

38.     Upon information and belief, Mr. Jensen raised this issue with DS's corporate leadership.

39.     In mid-October 2023, DS's Chief of Staff, Tracia Kraemer, requested that Mr. Levy's Training Department provide her with materials for the Trainings.

40.     Mr. Jensen communicated Ms. Kraemer's plan for the materials to Mr. Levy.

41.     Ms. Kraemer planned to disseminate the training materials to personnel who were on site, but had not completed the Trainings.

42.     She would then let Mr. Levy know when these employees had reviewed the materials and Mr. Levy's Department would give those employees a completion certificate and everyone would be in compliance.

43.     Ms. Kraemer's request was a request to facilitate a violation of ORR's training requirements.

44.     Mr. Levy refused Ms. Kraemer's request.

45.     Mr. Jensen supported Mr. Levy's refusal to comply with Ms. Kraemer's request.

46.      Ms. Kraemer persisted with her plan.

47.     Mr. Levy raised his concerns about Ms. Kraemer's plan to DS's Director of Compliance, Michael Henry, and asked for guidance.

48.    Mr. Levy also raised his concerns about Ms. Kraemer's plan to Christian Valenty and Michael Baker, DS senior leaders working on the ORR project, and asked for guidance.

49.    Mr. Henry, Mr. Valenty, and Mr. Baker did not provide Mr. Levy with guidance.

50.    Upon information and belief, they told Ms. Kreamer that Mr. Levy had raised concerns about her plan.

51.    Mr. Levy then called the ORR Training Supervisor, Shebony Foster, who was assigned to the DS sites.

52.    The ORR Training Supervisor confirmed that Ms. Kraemer's plan did not comply with ORR's requirements.

53.    The ORR Training Supervisor asked Mr. Levy to send an email summarizing his concerns.

54.    Mr. Levy sent an email to the ORR Training Supervisor, Ms. Foster, as requested. Mr. Levy sent the email from a private account because he feared retaliation.

55.    Following Mr. Levy's reporting, ORR sent investigators to the Texas site. Mr. Levy instructed his team to be honest and report any unethical, illegal, or suspicious behavior of company leadership to the government team.

56.    Ms. Kraemer directed Mr. Jensen that the Training Department needed to make the Trainings available in a self-led format on an online portal, instead of an approximately 2.5 hour long, live, in-person training session.

57.    Mr. Levy raised concerns about this format of delivering the Trainings to Mr. Jensen.

58.    Mr. Levy then spoke to the ORR Training Supervisor who was assigned to the sites.

59.    The ORR Training Supervisor confirmed that ORR preferred the in-person training format, but could not identify a requirement that would prohibit the self-led format for the Trainings.

60.    DS's training management software tracked the amount of time personnel spent in the self-led training.

61.    Shortly after Mr. Levy's Department rolled out the self-led training, he began noticing that personnel were completing the Trainings in approximately 1.5 *minutes*, which Mr. Levy interpreted as not appropriately participating in the Trainings and, instead, simply "clicking through" the online materials without being trained.

62.    Mr. Levy raised this issue to Mr. Jensen.  Upon information and belief, Mr. Jensen raised this issue to the program directors of the Texas and North Carolina facilities.

63.     DS turned a blind eye.

64.    In November 2023, Ms. Kraemer held a Training Department meeting at which she laid out a plan to remove Mr. Levy's Team from the Operations Department and place it within her line of reporting.

65.    When asked if the move would affect jobs, Ms. Kraemer stated on a group call that the people who didn't try to "build a coalition against" her were safe.

66.    This was a reference to Mr. Levy's reporting to ORR and raising concerns internally.

67.    In January 2024, Ms. Kraemer hired a Senior Director of Training, Ahada McCummings.

68.    Ms. McCummings was in the Employee Experience Department, which reported to Ms. Kraemer.

69.    The entire Training Team, which included Mr. Levy's Team, was moved from the Operations Department, to report to Ms. McCummings.

70.    In February 2024, Ms. McCummings held a Microsoft Teams call during which she laid out her vision, which had been approved by her boss, Ms. Kraemer, and HR.

71.    This involved removing Mr. Levy and his entire Team from the HHS/ORR contract, on which they had been working for two years.

72.    During the Teams call, Ms. McCummings also laid out who was going to be promoted to certain positions, before the positions had been posted.

73.    Mr. Levy and others who had raised concerns about the Trainings were not promoted.

74.    Mr. Jensen had been relegated to a support role for new employees.

75.    Mr. Jensen was removed from working on the ORR contract.

76.    Additionally, Ms. McCummings and Ms. Kraemer began treating employees who had raised issues about the Trainings poorly, by micromanaging them, monitoring their communications, and raising unjustified criticisms.

77.    By mid-February 2024, DS was still in gross violation of government policy, because there were still people on its sites that had not completed the Trainings.

78.    Mr. Levy reported the violations to the Department of Health and Human Services Office of Inspector General, at the end of February 2024.

79.    In March 2024, Ms. McCummings circulated an organizational chart which showed three Project Coordinator positions.

80.    Shortly thereafter, Ms. McCummings hired two new Directors and a Project Coordinator.

81.    Ms. McCummings gave one of the new Directors and the new Project Coordinator responsibility for the ORR contract responsibilities that had previously been assigned to Mr. Levy's team.

82.    In March 2024, Mr. Levy learned that personnel at the North Carolina facility had sexually harassed one of his former female subordinates while she was delivering the Trainings to personnel.  Mr. Levy brought this to the attention of Mr. Jensen and requested that two trainers be assigned to each training session to prevent sexual harassment of the trainers.  Upon information and belief, Mr. Jensen brought this to the attention of Ms. McCummings. Upon information and belief, Ms. McCummings denied this request and took no further action.

83.    Mr. Levy also complained about the behavior of the personnel that attended the training his former department conducted.  The personnel engaged in inappropriate behaviors at the facility including fighting, sexual conduct between employees, use of inappropriate sexually explicit language, and being under the influence of controlled substances. Mr. Levy reported this behavior and his concerns about the appropriateness of the personnel recruitment process to Mr. Jensen and Ms. Kraemer.  Upon information and belief, Ms. Kraemer did not take appropriate action.

84.    In April, Mr. Jensen resigned.

85.    After Mr. Jensen's resignation, Mr. Levy was moved around on the organizational chart every week with a different role, under different people.

86.    DS did not communicate with Mr. Levy about why his position was being moved around.

87.    On May 13, 2024, Mr. Levy received a meeting invitation for a 5:30 P.M. meeting with Ms. McCummings and Sr. Director of Human Resources, Alex Morris.

88.    He asked that the meeting be recorded, and Mr. Morris refused.

89.    During the meeting, Mr. Morris informed Mr. Levy that he was being terminated, effective immediately.

90.    In a contemporaneous letter, DS stated that Mr. Levy was terminated due to an organizational restructuring.

91.    However, Mr. Levy was designated as ineligible for rehire.

92.    If he had not been subject to whistleblower retaliation and if his employment had not been terminated, Mr. Levy would have continued working at DS until his retirement.

93.    Mr. Levy is presently 60 years old and had planned to work for DS until age 67.

94.    At the time of Mr. Levy's termination, he earned a salary of approximately $120,000 per year.  Additionally, he was eligible to receive an annual bonus.

95.    As a result of the retaliatory and/or unlawful termination of Mr. Levy's employment, he has suffered damages.

96.    Following the unlawful termination of his employment, Mr. Levy has been unable to secure alternative, comparable work.

97.    Therefore, Mr. Levy has incurred, and will continue to incur, lost wages and benefits.

98.    In addition, DS's retaliatory and/or unlawful termination has caused, and continues to cause, Mr. Levy emotional harm.

99.    In addition, Mr. Levy has incurred, and will incur, attorneys' fees and costs.

## COUNT I
## VIOLATIONS OF RSA 275-E:2

100.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

101.    The Defendant harassed, abused, intimidated, and discharged Mr. Levy because he, in good faith, reported what he reasonably believed were violations of laws or rules adopted under the laws of New Hampshire, a political subdivision of this state, or the United States, as described herein.

102.    As a result of Mr. Levy's good-faith actions, the Defendant wrongfully harassed, abused, and/or intimidated Mr. Levy, and terminated his employment, and Mr. Levy has suffered, and continues to suffer, substantial injury and damage, and seeks relief including, but not limited to, reinstatement, back pay, and reasonable attorneys' fees and costs, all within the jurisdictional limits of this Court pursuant to RSA 275-E:2, II.

**COUNT II**
**WRONGFUL TERMINATION**

103.    Mr. Levy re-alleges and incorporates herein by reference, all of the allegations contained in the preceding paragraphs.

104.    Mr. Levy was wrongfully terminated from his employment in violation of public policy for taking actions that public policy would encourage, namely, for reporting concerns of unsafe and/or illegal practices, as described herein.  *Cloutier v. Great Atlantic & Pac. Tea Co., Inc.*, 121 N.H. 915 (1981).

105.    The Defendant's wrongful termination of Mr. Levy's employment was motivated by bad faith, retaliation, and malice.  *Wenners v. Great State Beverages*, 140 N.H. 100, 103 (1995), *cert. denied*, 516 U.S. 1119 (1996).

106.    As a result of the wrongful termination of his employment, Mr. Levy has suffered, and continues to suffer, substantial injury and damage, including, but not limited to, back pay and benefits, front pay and benefits, and lost future earnings and benefits, physical pain and

suffering, emotional distress, and enhanced compensatory damages for the wanton, oppressive, and malicious actions of Defendant, all within the jurisdictional limits of this Court.

Respectfully submitted,

CHRISTOPHER L. LEVY, Plaintiff

By His Attorneys

UPTON & HATFIELD, LLP

Date:  November 13, 2024          By: /s/ Brooke Lovet Shilo
                                  Brooke Lovett Shilo (NHBA #20794)
                                  Heather M. Burns (NHBA #8799)
                                  10 Centre Street
                                  Concord, NH  03301
                                  (603) 224-7791
                                  bshilo@uptonhatfield.com
                                  hburns@uptonhatfield.com