UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Christopher L. Levy

    v.                                          Case No. 24-cv-381-AJ

Deployed Services, LLC

**ORDER**

Plaintiff Christopher L. Levy brings this lawsuit against his former employer, Deployed Services, LLC.[1] He alleges claims under the New Hampshire Whistleblowers' Protection Act (Count I) and New Hampshire common law (Count II). According to Levy, after he reported concerns regarding Deployed Services' unsafe and illegal practices, Deployed Services retaliated against him by terminating his employment.

Deployed Services now moves to dismiss all counts of Levy's complaint (Doc. No. 9) pursuant to Federal Rule of Civil Procedure 12(b)(6). Levy objects (Doc. No. 12).[2] For reasons explained below, the motion to dismiss is denied.

---

[1] The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), see Doc. Nos. 1, 19, and the parties consent to the jurisdiction of the undersigned magistrate judge. See Doc. No. 7.

[2] The parties also filed reply (Doc. No. 14) and surreply (Doc. No. 15) briefs.

**Applicable Legal Standard**

To survive a motion to dismiss based on Rule 12(b)(6), a plaintiff must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In testing a complaint's sufficiency, the court employs a two-step approach. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, the court must identify and disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (cleaned up). Second, after crediting as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, the court determines if the claim is plausible. Id. The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct. Twombly, 550 U.S. at 556.

**Background**[3]

Deployed Services provides direct care and supervision services for migrant children in North Carolina and Texas pursuant to a contract with the United States government. Under the terms of the contract, Deployed Services must comply with the United States Department of Health and Human Services ("DHHS") Office of Refugee Resettlement ("ORR") Unaccompanied Children Bureau Policy Guide (the "Policy"). The Policy, in turn, requires Deployed Services to provide training to onsite personnel on several topics, including preventing, detecting, and responding to sexual abuse and harassment. Consistent with the terms of the Policy, onsite personnel cannot have unaccompanied contact with the children in Deployed Services' care until they complete the required training. Accordingly, personnel must complete the training before they can physically enter the North Carolina and Texas facilities.

In March 2022, Levy began his employment with Deployed Services as a contract employee with the job title of project coordinator. In this role, Levy developed training for Deployed Services' personnel to comply with the Policy. The training covered the following topics: preventing sexual assault, trauma

---

[3] The court draws the following factual allegations from Levy's complaint (Doc. No. 1), and consistent with the applicable standard of review, the factual allegations are assumed true.

informed care, cultural competency, child level events, program level events, and the "Flores Settlement."[4]  On June 1, 2022, Levy transitioned from a contract employee to a "regular" employee of Deployed Services.  Although Deployed Services told Levy his job title would also change to care services training manager, his title never changed.  In this new role, Levy led Deployed Services' ORR training department, which was responsible for training development, conducting training, and ensuring compliance with ORR requirements.

Deployed Services tracked personnel training through KPA, a training management software.  After Levy ran certain reports in KPA, he discovered that personnel who had not completed the required training nevertheless entered the North Carolina and Texas facilities housing unaccompanied children.  Specifically, the reports identified over 100 individuals who had been permitted to enter facilities where they could have had contact with unaccompanied children without first completing the required training in violation of the ORR Policy.  Levy raised concerns about this noncompliance with the ORR Policy to his

---

[4] The Flores settlement refers to a settlement agreement entered into by the United States concerning standards for treatment and detention of noncitizen children. See K.O. by & through E.O. v. United States, 651 F. Supp. 3d 331, 338 (D. Mass. 2023).

supervisor, Christopher Jensen, who then raised the issue with Deployed Services' corporate leadership.

In October 2023, Deployed Services' Chief of Staff, Tracia Kraemer, asked Levy's department to provide her with the required training materials. As part of this request, Kraemer proposed that: she would disseminate the training materials to onsite personnel who had not yet completed the training; she would notify Levy once personnel completed the training; and Levy would then provide personnel with completion certificates. Levy believed that Kraemer's proposal violated the ORR Policy and training requirements. He, therefore, refused to comply with her request. Jensen supported Levy's decision. Nevertheless, Kraemer purportedly moved forward with her plan, which prompted Levy to raise his concerns with three other individuals in leadership positions at Deployed Services. None of these individuals provided Levy with guidance, and Levy believes these individuals shared his concerns with Kraemer.

Levy then reported his concerns to an ORR training supervisor, Shebony Foster, who was assigned to Deployed Services' facilities. Foster confirmed that Kraemer's plan did not comply with ORR requirements and asked Levy to send an email to her, summarizing his concerns. Levy sent Foster the requested email from his personal email account because he feared retaliation by Deployed Services. As a result of Levy's

5

report, ORR sent investigators to Deployed Services' Texas facility.

Following the investigation, Kraemer informed Jensen that the training department needed to make the training available in a self-led format on an online portal, instead of the hours-long, live, in-person training. When Levy raised concerns about self-led, online training with Foster, Foster shared that ORR preferred in-person training but did not prohibit the self-led format for training. Accordingly, Levy's department rolled out self-led training.

When Levy reviewed the self-led training data, tracked on KPA, he discovered that personnel were completing the training in under two minutes. Based on this information, Levy believed that personnel were not appropriately participating in the training, and he reported his concerns to Jensen. Jensen, in turn, shared these concerns with the program directors of the Texas and North Carolina facilities. According to Levy, Deployed Services turned a blind eye.

In November 2023, during a training department meeting, Kraemer announced her plan to remove Levy's team from the operations department and place it within her line of reporting. In response to a question about whether the restructuring would impact jobs, Kraemer allegedly stated that individuals who "didn't try to 'build a coalition against' her were safe."

6

Compl. (Doc. No. 1) ¶ 65. Levy understood this statement to be referring to his reports to ORR regarding safety and compliance concerns.

In January 2024, Kraemer hired Ahada McCummings for the role of senior director of training. Under the restructuring, Levy's team reported to McCummings. In February 2024, McCummings announced her plan, approved by Kraemer, to remove Levy's team from the ORR contract. McCummings also announced employee promotions to positions that were not yet posted. Levy and other employees who raised concerns about ORR compliance were not promoted. Jensen was relegated to a support role for new employees and removed from working on the ORR contract.

During this time, Deployed Services remained noncompliant with the ORR Policy because personnel continued to be onsite without completing the training. Levy reported his concerns to the DHHS Office of the Inspector General.[5]

In March 2024, McCummings circulated an organizational chart, which included three project coordinator positions. Shortly thereafter, McCummings hired two new directors and a

---

[5] During this time, Levy made additional reports to Deployed Services regarding concerns unrelated to ORR compliance and training requirements. Neither party, however, addresses these reports, and Levy does not argue that these reports form the basis of any claim.

project coordinator.  One of the new directors and the project coordinator became responsible for the ORR contract.

In April 2024, Jensen resigned.  Deployed Services then began moving Levy around the organizational chart to different roles on a weekly basis without explanation.  On May 13, 2024, Deployed Services terminated Levy's employment effective immediately.  Although Deployed Services represented that Levy's termination was due to an organizational restructuring, it designated Levy as ineligible for rehire.

## DISCUSSION

Deployed Services moves to dismiss both counts of Levy's complaint.  It argues that Levy's claim under the New Hampshire Whistleblowers' Protection Act, RSA 275-E:2 ("WPA") fails because: (1) Levy alleges no violations of law or rule in his complaint, and therefore, cannot establish that he engaged in an act protected by the WPA; and (2) Deployed Services' legitimate, non-discriminatory reason for terminating Levy precludes him from showing a causal connection between his protected conduct and his termination.  As to Levy's wrongful discharge claim, Deployed Services asserts that Levy's complaint contains no allegations that he was terminated due to improper motives and that Levy cannot show he was terminated for performing an act that public policy would encourage.

8

Levy objects and argues that he sufficiently alleges facts supporting the elements of his two claims. The court addresses each claim in turn.

## I. Violation of the WPA (Count I)

In relevant part, the WPA states:

> No employer shall harass, abuse, intimidate, discharge, threaten, or otherwise discriminate against any employee regarding compensation, terms, conditions, location, or privileges of employment because . . . [t]he employee, in good faith, reports or causes to be reported, verbally or in writing, what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States.

RSA 275-E:2, I(a). To survive a motion to dismiss, a plaintiff must show: (1) he engaged in an act protected by the WPA; (2) he suffered an employment action proscribed by the WPA; and (3) there was a causal connection between the protected conduct and the proscribed employment action. Cluff-Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 674, 156 A.3d 147 (2017).

### A. Act Protected by the WPA

The WPA protects an employee's good faith report of what the employee reasonably believes is a violation of any law or rule. RSA 275-E:2, I(a). For the report to be protected, the WPA "does not require an actual violation of a law or rule but only that an employee reasonably believe that such a violation

9

has occurred." Cluff-Landry, 169 N.H. at 674 (quotation omitted). This is an objective inquiry: "whether a reasonable person might have believed that the employer was acting unlawfully." Id. (quotation omitted).

The New Hampshire Supreme Court made clear that the WPA does not "require a reporting employee to cite to the alleged violation." In re Fred Fuller Oil Co., 144 N.H. 607, 610-11, 744 A.2d 1141 (2000). It reasoned that imposing such a requirement would impermissibly exclude unsophisticated employees from protection under the WPA. Id. Instead, the court considers "a report to have been made if a reasonable employer would have understood from an employee's complaint that the employee was reciting a violation of law." Id. at 611.

Even "obscure" or "vague" reports by an employee can qualify as an act protected by the WPA, so long as the reports concern unlawful activities. See Hidalgo-Semlek v. Hansa Med., Inc., 498 F. Supp. 3d 236, 264-65 (D.N.H. 2020). For example, in Hidalgo-Semlek, the plaintiff objected to sharing certain survey results for marketing purposes and to "misusing" data concerning the Strategic Registry of Transplant Recipients. Id. at 263-64. She purportedly believed this conduct violated the Health Insurance Portability and Accountability Act ("HIPAA") and federal law. Id. The plaintiff, however, failed to cite HIPAA or any specific provision of law and failed to use the

10

words illegal or unlawful in her communications with her employer. Id. Nevertheless, the court concluded that the plaintiff's WPA claim survived summary judgment because her communications expressed "enough discomfort or concern that a reasonable employer would have understood that [she] was reporting some violation of law." Id. at 264; see also In re Leonard, 147 N.H. 590, 595-96, 809 A.2d 762 (2002) (finding an employee's objection to employer that employee did not want to work on his scheduled day off was a "report" of a violation of law by an employee, within meaning of the WPA, despite the fact that employee did not cite the state day-of-rest statute; employer was presumed to have been familiar with the laws and regulations governing its fuel delivery business).

   Deployed Services argues that Levy alleges no violation of law or rule in his complaint, and instead, only claims violations of contractual obligations, which are not actionable under the WPA.  The court disagrees.  At this juncture, Levy's allegations and the reasonable inferences drawn from those allegations, plausibly state his reasonable belief that he reported unlawful conduct by Deployed Services.  Specifically, through KPA reports, Levy learned that over 100 individuals were onsite at facilities with unaccompanied children without having completed mandatory training, including training on preventing, detecting, and responding to sexual abuse and harassment.  After

Deployed Services' response suggested that it wanted Levy to provide training completion certificates without proper verification, Levy escalated his report to an ORR training supervisor, Foster. Consistent with Foster's request, Levy sent her an email, summarizing his concerns, from his personal account due to fears of retaliation, and this prompted ORR to send investigators to Deployed Services' Texas facility. Levy also reported his ongoing concerns to the DHHS Office of the Inspector General.

As argued by Levy, the totality of these allegations support Levy's reasonable belief that he was reporting violations of the law. The essence of Levy's complaints concern unauthorized personnel having contact with unaccompanied children and Deployed Services' efforts to circumvent the mandatory training and authorization process. While this circumvention violated the ORR Policy, it also implicates misrepresentations by a contractor to the government. See 31 U.S.C. § 3729(a)(1)(A) (creating civil liability where a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"); c.f. Wirth v. Salesforce, Inc., 749 F. Supp. 3d 231, 238 (D. Mass. 2024) (noting that in the context of a whistleblower claim under the Sarbanes-Oxley Act, "fraud does not need to have ever occurred"

because the Act exists "to prevent potential fraud in its earliest stages.").

While Deployed Services casts doubt on the reasonableness of Levy's belief that he was reporting violations of the law, the court cannot conclude at this juncture that Levy's belief was unreasonable in light of the subject matter and circumstances surrounding his reports.  Accordingly, considering reasonable inferences drawn from Levy's allegations, a reasonable employer could have understood from Levy's complaints that he was reciting a violation of law, Hidalgo-Semlek, 498 F. Supp. 3d at 265 (quoting In re Fred Fuller Oil Co., Inc., 144 N.H. at 611), and therefore, Deployed Services' motion to dismiss (Doc. No. 9) is denied on this basis.

### B. Causal Connection

As noted by the New Hampshire Supreme Court, "the federal standards used to evaluate retaliation claims under Title VII of the Civil Rights Act are useful in resolving claims under RSA chapter 275-E."  In re Hardy, 154 N.H. 805, 812, 917 A.2d 1237 (2007) (cleaned up).  Under Title VII's retaliation provision, a plaintiff's allegations regarding a causal connection "must simply . . . give rise to a plausible inference that retaliation occurred."  Frith v. Whole Foods Market, Inc., 38 F.4th 263, 276-77 (1st Cir. 2022).

Deployed Services argues that because Levy alleges the proffered reason for his termination - organizational restructuring - he fails to establish a causal connection between his protected conduct and his termination.  The court disagrees.  According to Levy, during the November 2023 meeting Kraemer stated that only the jobs of individuals who "didn't try to 'build a coalition against' her were safe."  Compl. (Doc. No. 1) ¶ 65.  The restructuring occurred over several months, with the hiring of McCummings and a new director and project coordinator to oversee ORR compliance.  Shortly after the restructuring was complete, Deployed Services terminated Levy's employment and designated Levy as ineligible for rehire.  At this juncture, such allegations adequately give rise to a plausible inference that the termination was motivated by retaliation.  See Frith, 38 F.4th at 276-77.  Accordingly, Deployed Services' motion to dismiss (Doc. No. 9) is denied as to Levy's WPA claim (Count I).

## II. Wrongful Discharge (Count II)

To make out a claim for wrongful discharge, a plaintiff must establish: "(1) the employer terminated the employment out of bad faith, malice, or retaliation; and (2) the employer terminated the employment because the employee performed acts that public policy would encourage or because [he] refused to

14

perform acts that public policy would condemn." Donovan v. S. N. H. Univ., 175 N.H. 489, 492, 293 A.3d 1175 (2022).

### A. Bad Faith, Malice, or Retaliation

An employer's bad faith, malice, or retaliation may be established where: "(i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee." Cabacoff v. Fedex Ground Package Sys., Inc., No. 23-cv-084-LM, 2024 WL 1558606, at *2 (D.N.H. Feb. 5, 2024) (quoting Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001)). "Bad faith can also be discerned from the course of events surrounding an employee's discharge, the manner in which the plaintiff was discharged, or shifting reasons for an employee's termination." Id. (quotation omitted).

Deployed Services argues that Levy's allegations indisputably demonstrate that it terminated Levy due to an organizational restructuring only, and therefore, there can be no finding of bad faith. As already noted, the organizational restructuring is Deployed Services' stated reason for terminating Levy's employment. Levy's factual allegations, however, adequately challenge the credibility of that stated reason and suggest an ulterior, retaliatory motive for terminating his employment. For example, Kraemer's purported

15

statements to employees that individuals who "didn't try to 'build a coalition against' her were safe," Compl. (Doc. No. 1) ¶ 65, suggest a retaliatory motive behind the restructuring. Moreover, Deployed Services designated Levy as ineligible for rehire, which seemingly contradicts the stated reason for discharge. Thus, the record does not support the stated reason for discharge and the circumstances surrounding Levy's discharge adequately allege that Deployed Services terminated him out of bad faith, malice, or retaliation. See Cabacoff, 2024 WL 1558606, at *2. Accordingly, Deployed Services' motion to dismiss (Doc. No. 9) is denied on this basis.

### B. Public Policy

In a wrongful discharge claim, the public policy supporting an employee's conduct "can be based on statutory or nonstatutory policy at the state or federal level." Hidalgo-Semlek, 498 F. Supp. 3d at 249 (quoting Karch v. BayBank FSB, 147 N.H. 525, 537, 794 A.2d 763 (2002)). "Public policy includes a wide range of societal goals including safety and public welfare, protection of an at-will employee's promised compensation, and good faith reporting of reasonably perceived improper activity." Id. (quoting Sheeler v. Select Energy & NEChoice, LLC, No. 03-cv-59-JD, 2003 WL 21735496, at *8 (D.N.H. Jul. 28, 2003)).

Deployed Services argues that Levy fails to allege that he was terminated for taking actions that public policy would

16

encourage. The court disagrees. For reasons explained above, Levy's alleged conduct, including his reports to ORR raising concerns about noncompliance with mandatory training to protect unaccompanied children, is supported by the WPA and constitutes an act that public policy would encourage. See Hidalgo-Semlek, 498 F. Supp. 3d at 257 (noting that a jury could conclude plaintiff was acting in furtherance of the public policy reflected in RSA 275-E:2, which "recognizes a public policy favoring the good faith reporting of reasonably perceived illegal actions of employers by employees without retaliation, even if it is ultimately determined that the employer engaged in no illegal activity."). As also discussed above, Levy adequately alleges a causal connection between his reports and the termination of his employment, including Kraemer's statements during the November 2023 meeting, the restructuring, and Deployed Services' designation of Levy as ineligible for rehire. The fact that the restructuring took several months to implement before Deployed Services terminated Levy's employment does not alter the court's conclusion in light of the other corroborating allegations. Cf. Ahern v. Shineski, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."). In sum, Levy

17

adequately alleges a wrongful discharge claim, and therefore, Deployed Services' motion to dismiss (Doc. No. 9) is denied as to this claim (Count II).

## **CONCLUSION**

For the reasons set forth above, defendant's motion to dismiss (Doc. No. 9) is denied.

SO ORDERED.

*Andrea K. Johnstone*
Andrea K. Johnstone
United States Magistrate Judge

April 16, 2025

cc:   Counsel of Record